NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                        :
THERESA PORTER,                         :
                                        :
                     Plaintiff,         :          Civil No. 14-4004 (RBK)
                                        :
          v.                            :          **OPINION**
                                        :
CAROLYN W. COLVIN, Acting               :
Commissioner of Social Security,        :
                                        :
                     Defendant.         :
_____     :


**KUGLER**, United States District Judge:

This matter comes before the Court on an appeal filed by Plaintiff Theresa Porter

("Plaintiff") from a decision of the Acting Commissioner of Social Security, Carolyn W. Colvin

(the "Commissioner"), denying Plaintiff disability insurance benefits ("DIB") pursuant to 42

U.S.C. § 423, et seq.  The Court has jurisdiction to decide this appeal pursuant to Section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  For the reasons expressed below, the

Court will vacate the decision of the Commissioner and remand the matter to the Administrative

Law Judge ("ALJ") for further proceedings consistent with this Opinion.

**I.     BACKGROUND**

**A.  Procedural History**

On September 22, 2010, Plaintiff protectively filed a Title II application for a period of

disability and DIB, alleging October 1, 2007 as the disability onset date.  Tr. 83-86, 165-71, 194.

Plaintiff alleged disability due to degenerative and discogenic disorders of the back and

affective/mood disorders.  Tr. 83-86.  Plaintiff's initial claim was denied on January 29, 2011.

Tr. 90.  Plaintiff subsequently filed a Request for Reconsideration, Tr. 94, which was denied on

August 23, 2011.  Tr. 95-96.  Thereafter, Plaintiff filed a Request for Hearing by an

Administrative Law Judge.  Tr.  98-101.  This hearing took place on January 4, 2013, before ALJ

Nicholas Cerulli, during which Plaintiff was represented by an attorney.  Tr. 39-82.  On January

11, 2013, the ALJ issued a decision finding Plaintiff not disabled and thus denying benefits.  Tr.

17-32.  Plaintiff then filed a Request for Review by the Appeals Council on March 6, 2013,

which was denied on May 8, 2014.  Tr. 1-4.  This appeal followed.

### B.  Plaintiff's Physical Condition and Medical History

Plaintiff visited Cumberland Orthopedic on October 3, 2007, complaining of an injury to

her back that she sustained while moving her son's bed.  Tr. 770.  Dr. Jennifer Vanderbeck

examined Plaintiff during this visit, and observed that Plaintiff was suffering from severe pain in

her back radiating down both legs.  Id.  Plaintiff indicated that she had gone to the emergency

room the prior Monday and received Vicodin and muscle relaxants.  Id.  Dr. Vanderbeck noted

that Plaintiff's motor examination was 5/5 in all muscle groups, and she had a negative straight

leg raise bilaterally.  Id.  Dr. Vanderbeck recommended Plaintiff continue the Vicodin and

muscle relaxants, and gave Plaintiff a note to remain light duty at work.  Id.  It is from this injury

that Plaintiff alleges her disability onset date of October 1, 2007.  Tr. 53.

On October 8, 2007, Plaintiff had X-rays conducted by Dr. Susan Finder of Eastland

Diagnostic Institute in Vineland, New Jersey.  Tr. 423-27.  X-rays of Plaintiff's cervical spine,

thoracic spine, and lumbar spine were reported as unremarkable and showed no fractures,

vertebral body anomalies or bone lesions.  Tr. 424-25, 427.  An MRI of Plaintiffs lumbar spine,

conducted on October 30, 2007, revealed a small central disc herniation with annular tear at L4-

L5 that impinged nerve roots, and an otherwise intact spinal canal, well maintained intervertebral disc spaces, and normal signal intensity of the bones and muscular structures.  Tr. 434.

On October 17, 2007, Plaintiff had her first visit with Dr. Andrew Glass of Coastal Physicians & Surgeons.  Tr. 643.  Dr. Glass examined Plaintiff, and noted Plaintiff was in severe pain, had restricted anterior flexion to 30 degrees, left paramedian lower lumbar and lumbosacral point tenderness with paravertebral muscular spasm, positive left sciatic notch tenderness, and positive left straight leg raising.  Tr. 643-44.  Dr. Glass also wrote Plaintiff a note stating she could not work pending her next evaluation.  Tr. 688.  Plaintiff continued to visit Dr. Glass through 2011.  Tr. 616.  On November 6, 2007, December 5, 2007, and January 10, 2008, Dr. Glass continued to report that Plaintiff had restricted anterior flexion, bilateral lower point tenderness, bilaterally antalgic gait with stooped posture, and 5/5 power throughout.  Tr. 640-42.  Dr. Glass also provided Plaintiff with notes excusing her from work on these dates, as well as on February 5, 2008.  Tr. 681-83, 685-86.

Dr. Glass examined Plaintiff on February 26, 2008, and reported that Plaintiff had 4+/5 in bilateral tibialis anterior, bilaterally antalgic gait with stooped posture, L4-5 herniated nucleus pulposus, and grade 5 internal disc disruption at the L4-5 level.  Tr. 639.  At this visit he discussed treatment options with Plaintiff, and they settled on surgery consisting of L4-5 laminectomy, discectomy, posterior lumbar interbody arthrodesis, instrumentation with pedicular screw fixation and posterolateral arthrodesis, otherwise known as a low-back fusion.  Tr. 45, 639.  Dr. Glass gave Plaintiff a note excusing her from work until her scheduled surgery on April 4, 2008.  Tr. 680.

Post-surgery, on April 14, 2008, Dr. Glass reported that Plaintiff was ambulating independently, her neurological testing power was 5/5 throughout, and her sensory exam was

without dermatomal deficit.  Tr. 637.  Dr. Glass also suggested Plaintiff begin a progressive

ambulation program.  Tr. 637.  On April 29, 2008, Dr. Glass reported that Plaintiff's back pain

was slowly improving, and that X-rays revealed satisfactory prosthetic position, instrumentation

position and spinal alignment.  Tr. 636.  On June 26, 2008, Plaintiff visited Dr. Glass, reporting

increased low back pain after she was involved a minor car accident, and Dr. Glass noted her

lumbar anterior flexion was restricted to 45 degrees with left paramedian lower lumbar point

tenderness, her neurological testing power was 5/5 throughout, and her sensory exam was

without dermatomal deficit.  Tr. 635.  Dr. Glass also reported Plaintiff had 5/5 power and

sensory exam without dermatomal deficit from examinations on May 27, 2008 and July 10,

2008.  Tr. 633-34.  He also noted on July 10 that Plaintiff had lower lumbar point tenderness, and

suggested Plaintiff begin postoperative physical therapy.  Tr. 633.

Physical therapy records with Heartland Rehabilitation Services indicate that Plaintiff

initially attended therapy three times a week from November 2007 to January 9, 2008.  Tr. 327-

44.  Plaintiff resumed her therapy on July 21, 2008 and attended until August 11, 2008.  Tr. 346-

54.  On August 12, 2008, Dr. Glass reported that the physical therapy was actually making

Plaintiff feel worse, and placed the plan on hold pending neurosurgical reevaluation.  Tr. 632.

On visits ranging from September 24, 2008 to February 13, 2009, Dr. Glass reported that

Plaintiff had restricted anterior flexion movement with bilateral lower lumbar point tenderness,

but no focal motor or sensory deficit and neurological testing power of 5/5 throughout.  Tr. 628-

31.  Dr. Glass also gave Plaintiff a note, dated October 17, 2008, excusing her from work

pending a December 11, 2008 evaluation.  Tr. 677.

On her February 13, 2009 visit, because of continuing pain, Dr. Glass suggested Plaintiff

try Lyrica, but noted on March 10, 2009, that Plaintiff experienced "intolerable side effects"

from the Lyrica and no pain relief.  Tr. 625, 628.  Furthermore, from June 18, 2009 to June 23, 2011, Dr. Glass consistently reported that Plaintiff had continued back pain, limited anterior flexion movement and lumbar point tenderness, but no focal motor or sensory deficit and 5/5 power.  Tr. 616-24.  Plaintiff and Dr. Glass also continued to discuss treatment options, including a spinal cord stimulator trial.  Id.

Dr. Glass completed a Physical Residual Functional Capacity ("RFC") Questionnaire on November 1, 2011.  Tr. 737-40.  Dr. Glass indicated that Plaintiff's impairments lasted or could be expected to last at least twelve months, and that she frequently experienced pain severe enough to interfere with attention and concentration needed to perform even simple work tasks.  Tr. 738-39.  He indicated "N/A" to whether Plaintiff could tolerate work stress, and indicated that Plaintiff could only stand or sit for 30 minutes at a time.  Tr. 739.

Plaintiff also received treatment with anesthesiologist Dr. Keith D. Strenger of PainCare, P.C., beginning on January 17, 2008.  Tr. 462.  Dr. Strenger recommended Plaintiff undergo a provocative lumbar discography.  Tr. 462-65.  On February 19, 2008 Dr. Strenger diagnosed Plaintiff with lumbar degenerative disc disease and degerenarative joint disease, symptomatic L4-L5 disc with grade V midline posterior annular tear, discogenic axial low back pain, and left lumbar radiculopathy, and suggested surgery with Dr. Glass.  Tr. 460-61.

Plaintiff did not return to see Dr. Strenger until April 2, 2009, when he reported that Plaintiff's straight leg raise was negative bilaterally but that she remained in pain.  Tr. 457-58.  In his diagnostic impression, Dr. Strenger reported that Plaintiff had lumbar degenerative disc disease and degenerative joint disease status post L4-L5 posterior lumber instrumented interbody fusion, possible failed back syndrome-post laminectomy syndrome, chronic depression with some symptom amplification, extreme morbid obesity, and lumbar radiculopathy.  Tr. 458.  To

address her pain, Dr. Strenger performed nerve root blocks on April 20, 2009.  Tr. 454.  On May 8, 2009, Plaintiff indicated to Dr. Strenger that although she initially felt an 80 percent relief of pain, that pain has subsequently returned and persisted.  Tr. 454.  At this visit, Dr. Strenger otherwise provided the same diagnostic impressions as her pre-procedure visit.  Tr. 455.  Dr. Strenger performed another round of nerve root blocks on June 1, 2009, but reported on June 12, 2009 that they did not alleviate Plaintiff's pain and that Plaintiff's response to the blocks was negative.  Tr. 451-52.  On July 16, 2009, Dr. Strenger noted that Plaintiff should see a pain psychologist, and that Plaintiff's depression could be acting as a pain amplifier.  Tr. 448-49.  He suggested Plaintiff use a spinal cord stimulator, which she was reluctant to try.  Tr. 449.  Dr. Strenger also noted that Plaintiff was "somewhat resistant" to weight loss and home-based exercise, and had made little progress in these areas.  Id.  On November 10, 2009, Dr. Strenger noted that Plaintiff reported continued constant pain, could sit for at most 90 minutes at a time, and stand for two hours at a time.  Tr. 445.  He noted at this point he had little to offer Plaintiff besides spinal cord stimulation, which she had indicated she did not wish to pursue.  Tr. 445-46.

Plaintiff began treatment with another anesthesiologist, Dr. Malind Patharkar of Advanced Spine and Pain, LLC, on May 18, 2011.  Tr. 749-51.  At this examination, Dr. Patharkar noted that Plaintiff had hypersensitivity to touch on the left side of her back, range of motion and rotation reduced by 25 to 30 percent, and positive straight leg raise test on the left side at 60 degrees.  Tr. 750.  He also noted that Plaintiff had 5/5 motor strength, and sensory of the upper and lower extremities was intact without any focal deficits.  Tr. 750.  Dr. Patharkar diagnosed Plaintiff with displacement of lumbar discs, lumbar radiculitis, clinical, lumbar degeneration of intervertebral disc, post laminectomy syndrome, and lower back pain syndrome, and planned to treat Plaintiff with steroid injections.  Tr. 751.  On June 30, 2011 and August 16,

2011, Dr. Patharkar gave Plaintiff Transforanimal Lumbar Epidural Steroid Injections.  Tr. 753-54.  Dr. Patharkar's treatment records from June 15, 2011, to March 14, 2012, indicated that Plaintiff had limited range of motion, tightness/spasm, and tenderness upon palpation but 5/5 power in her back.  Tr. 866-73.  Follow up appointments by Dr. Patharkar's Nurse Practitioner Maryann Masci, ranging from April 25, 2012, to May 25, 2012, indicate that Plaintiff continued to experience pain, described on average as a 5 out of 10 on a pain scale.  Tr. 875-82.  On July 18, 2012, Plaintiff experienced pain at the level of 8 or 9 out of 10, and on August 15, 2012, she reported pain at 6 out of 10.  Tr. 883-87.  The nurse noted that standing, walking, weather changes, and lifting heavy weights worsened these pains.  Id.

Diagnostic testing throughout this time period revealed the following.  A May 21, 2008 X-ray of the lumbar spine showed no fracture, vertebral body anomaly, or bone lesion.  Tr. 473.  Plaintiff also had an X-ray taken of her lumbar spine on October 6, 2008, which showed an intact spinal canal and no disc herniation or significant enhancing epidural scar formation.  Tr. 471.  A February 27, 2009 Electromyogram revealed mild abnormality with chronic early denervation within the left L4-5 myotome, and otherwise no evidence of neuropathy or myopathy.  Tr. 627.  An MRI of Plaintiff's lumbar spine taken on July 30, 2012 revealed intervertebral gait on L4-L5 with no disc herniation, and minimal disc bulge on L5-S1 with no canal narrowing.  Tr. 891, 893.  The MRI operator concluded that Plaintiff was "status post fusion and decompression at the L4 and L5 levels," and that there was no disc herniation, no stenosis, and good alignment of the vertebrae.  Tr. 892.

Plaintiff also underwent several one-time consultative examinations with state agency doctors.  On April 23, 2009, Plaintiff saw Dr. Nityashuba Khona, who noted that Plaintiff had full range of motion and 5/5 strength in both her upper and lower extremities, and a normal

straight leg raise test bilaterally.  Tr. 773-74.  Plaintiff underwent a consultative exam with Dr. Ronald Bagner on June 27, 2011, who observed that Plaintiff had antalgic gait and had difficulty getting on and off the examination table, but had no motor or sensory abnormality in the upper or lower extremities, and a 5/5 grip bilaterally.  Tr. 711-12.  Dr. Bagner also noted that Plaintiff had back pain on straight leg raising on her left side but not her right.  Tr. 711.

Furthermore, several state consultants performed RFC assessments on Plaintiff.  On May 12, 2009, Dr. M. McLamon found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and had unlimited push or pull ability.  Tr. 778.  He also noted Plaintiff could climb ramps and stairs frequently, ladders and ropes occasionally, could stoop, kneel, and crouch frequently, and crawl occasionally.  Tr. 779.  Dr. McLamon determined that Plaintiff's exertional activities were limited, and stated "onset 10/08 as alleged would be supported" (presumably referring to the alleged October 2007 onset date).  Tr. 784.  Dr. Melvin Golish affirmed this determination on November 16, 2009.  Tr. 785.  On January 28, 2011, Dr. Seung Park found that Plaintiff could stand and walk for four hours in an eight-hour workday, could sit for six hours, could occasionally climb and crawl, and had unlimited ability to push and pull.  Tr. 29-30, 501. Dr. Joseph Udomsaph confirmed both Dr. Park's and Dr. McLamon's RFC determinations on August 23, 2011.  Tr. 30, 734.

Plaintiff completed a Social Security Adult Functioning Report on December 4, 2010. Tr. 208.  In this report, Plaintiff indicated she goes shopping for groceries and is able to pay bills and count change.  Tr. 211.  She stated she visits her brother who lives a mile away almost every day.  Tr. 212.  Furthermore, Plaintiff's husband, William Porter, completed an Adult Third Party Function Report on December 4, 2010.  Tr. 220.  Mr. Porter reported that Plaintiff cannot lift

more than 20 pounds, cannot go up stairs without using handrails or taking breaks, and cannot sit for long periods of time.  Tr. 225.  He noted that Plaintiff is often unable to complete household tasks because of her back and leg pain.  Tr. 222.

At her hearing before the ALJ, Plaintiff stated that she was 41 years old, 5'9" tall, and weighed 240 pounds, having gained fifty pounds since her surgery due to lack of exercise because of pain.  Tr. 48-49.  She stated that she is able to get up in the morning to get her children ready for school, and helps pack their lunches.  Tr. 50.  She is able to drive a car, but does so as little as possible because she experiences back and leg pain when she drives.  Tr. 50.  She stated she experiences pain in her lower back and left leg "all the time," and that it lasts all day, and that the pain in her leg "feels like somebody is stabbing my leg.  Cold sensation."  Tr. 56.  She testified that she has a lot of bad days with regards to her pain where the pain level is an 8 out of 10.  Tr. 56-57.  The pain has also begun to spread to her right leg.  Tr. 58.

Plaintiff stated that her back pain prevents her from working.  Tr. 56.  Plaintiff also testified that she is only able to lift and carry two pounds at one time, and is only able to sit down for fifteen minutes to a half hour at a time.  Tr. 65.  She stated she can only stand for less than 10 minutes at a time, and can only walk less than a quarter of a mile before having to stop.  Tr. 65.  Plaintiff further stated she cannot bend, stoop, squat or kneel, and cannot reach very far with her arms because of her back pain.  Tr. 65-66.  Additionally, Plaintiff noted she cannot complete tasks because her pain affects her ability to concentrate.  Tr. 67.

Plaintiff testified that she underwent physical therapy three days a week for approximately three months after her April 2008 surgery, but that it actually made her condition worse.  Tr. 60.  She stated she also currently takes several medications for pain including Cymbalta, Lyrica, and Trazodone, but that they do not provide any pain relief.  Tr. 60-61.  She

further noted that she underwent multiple injections with Dr. Patharkar, but these procedures did not provide any tangible pain relief.  Tr. 61.  She had not yet undergone the spinal cord stimulator treatment, and was hesitant to try it, but stated she was now willing to undergo the procedure because she was "tired of being in pain."  Tr. 62.

### C. Plaintiff's Mental Health History

On July 13, 2011, Plaintiff underwent a mental status examination with Dr. Theodore Brown Jr., Ph. D.  Tr. 715.  Dr. Brown found that Plaintiff had a coherent and goal directed thought process, but had below average cognitive and intellectual functioning.  Tr. 717.  As such, he diagnosed her with "Adjustment Disorder with Mixed Depressed Anxiety Features due to Back Pain," and assigned a Global Assessment of Functioning ("GAF") score of 55 to 60.  Id.

Plaintiff also underwent a Psychiatric Review Technique with Dr. Clara Castillo-Velez on August 22, 2011.  Tr. 720.  Dr. Castillo-Velez determined that Plaintiff had non-severe impairments that stemmed from 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. Id.  Dr. Castillo-Velez found that these conditions caused only mild functional limitations in Activities of Daily Living, Maintaining Social Functioning, and Maintaining Concentration, Persistence, or Pace.  Tr. 730.

Plaintiff also underwent several psychological examinations with Dr. Ellen Shupe, Ph.D., beginning on November 1, 2011.  Tr. 796.  Dr. Shupe diagnosed Plaintiff with depression, anxiety, and chronic pain, and noted that Plaintiff had limitations in her ability to participate in family activities and an inability to tolerate the physical demands of retail work.  Tr. 796.  She also noted that Plaintiff had mild levels of environmental stress and functional impairment, and assigned her a GAF score of 64.  Tr. 796.  Dr. Shupe examined Plaintiff again on December 13, 2011, finding that Plaintiff now had moderate levels of environmental stress and functional

impairment.  Tr. 795.  Dr. Shupe continued to see Plaintiff from January 5, 2012 to May 3, 2012,

noting that environmental stress and functional impairment remained at the moderate level.  Tr.

791-94.  On the May 3 visit, Dr. Shupe discussed using the spinal cord stimulator with Plaintiff,

and subsequently wrote a report to Dr. Patharkar regarding this examination.  Tr. 788-89, 791.

In the report, Dr. Shupe noted that Plaintiff's function varied from being able to do some

household tasks and light exercise to being unable to sustain any physical activity for an

extended period, and that she experiences episodes of depressed mood that could be reduced in

intensity with Cymbalta, but was not experiencing depression at the time.  Tr. 788.  Dr. Shupe

further recommended that Plaintiff not undergo the spinal cord stimulation because she was not

psychologically prepared for the procedure.  Tr. 789-90.  Additionally, Dr. Shupe examined

Plaintiff on May 30, 2012, noting that she was much improved, that she remained consistent in

her role as a parent, and that she maintained satisfying social interactions, thus reducing her

levels of environmental stress to mild.  Tr. 790.

     At the hearing before the ALJ, Plaintiff stated that she had received treatment from a

psychiatrist for depression that stemmed from the effects of her pain.  Tr. 64.  She stated that she

took Cymbalta for the depression, which helped with the symptoms and relieved her feelings of

aggravation and discouragement.  Tr. 64-65.

### D. Plaintiff's Work History

     Plaintiff has the education of a high school graduate.  Tr. 46.  Plaintiff had difficulties in

school – she was placed in smaller, special needs classrooms, and had been diagnosed with

comprehensive problems, reading problems, and limited math skills.  Tr. 46.  Plaintiff had

worked between the years 1994 and 2003 as a pharmacy technician at a drug store; her duties

included taking prescriptions, answering phones, and checking customers out at the register.  Tr.

55-56.  Plaintiff next worked as a bank teller between the years 2003 and 2004, but experienced difficulties because she had a hard time following the steps required for handling the money.  Tr. 55.  Plaintiff's counsel stated that Plaintiff left this job because her education limited her ability to perform.  Tr. 47, 74.  Plaintiff then became self-employed in a house and motel cleaning business during 2005 and 2006, but stopped this business because she was not making any money.  Tr. 54-55.  Plaintiff last held a job in 2007 at Shoprite, where she worked in customer service and at the checkout register.  Tr. 54.  She stated that she did not have any difficulties performing this job.  Id.

At the hearing, vocational expert ("VE") Marian R. Marracco testified that Plaintiff could not perform any past relevant work.  Tr. 79.  She further testified that a hypothetical individual of Plaintiff's age, education, relevant work experience, and RFC could perform the following jobs that exist in the national economy: small parts assembler, of which there are 235,910 jobs nationally and 1,470 jobs regionally; lens inserter, of which there are 235,910 jobs nationally and 5,540 jobs regionally; and laminator, of which there are 66,330 jobs nationally and 1,740 jobs regionally.  Tr. 79.  The VE indicated that these numbers were consistent with the information found in the Dictionary of Occupational Titles ("DOT").  Tr. 79.

## II.   LEGAL STANDARDS

### A.  Standard of Review of the Commissioner's Decision

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel,

186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001).  A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.")  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schoenwolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

**B.  The Five-Step Inquiry**

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore eligible for DIB benefits.  20 C.F.R. § 404.1520(a)(4);  Jones v. Barnhart,

364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in any "substantial gainful activity."  Such work activity bars the receipt of benefits.  20 C.F.R. § 404.1520(b).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have such a severe impairment that limits his ability to do basic work activities, the claim will be denied.  Id.  If the Commissioner finds that the claimant's condition is severe, the Commissioner moves to the third step and determines whether the impairment meets or equals the severity of a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, then it is presumed that the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to his "past relevant work."  20 C.F.R. § 404.1520(f).  If the Commissioner finds the claimant unable to resume past relevant work, in the fifth and final step, the Commissioner determines whether the claimant can adjust to other work.  If the claimant has the capacity to perform other work available in significant numbers in the national economy, based upon factors such as the claimant's age, education and work experience, the claimant will be found not disabled.  20 C.F.R. § 404.1520(g).  If the claimant cannot make an adjustment to other work, he will be found to be disabled.  Id.

III.   **DISCUSSION**

   **A.  The ALJ's Decision**

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured.  Tr. 22.  At step two,

the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, lumbar discogenic syndrome, status post lumbar fusion, and obesity.  Id.  Regarding Plaintiff's anxiety and depression, the ALJ found that these were non-severe impairments because they resulted in at most minimal limitations on Plaintiff's ability to perform work-related activities when properly treated.  Id.  The ALJ cited the initial examination by Dr. Shupe, who assigned Plaintiff a GAF score of 64, reflecting only mild symptomatology.  Id.  Furthermore, in a subsequent examination, Dr. Shupe noted that Plaintiff maintained active contact with her friends and an active parenting role.  Id.  The ALJ acknowledged that Dr. Brown had assigned Plaintiff a GAF score of 55 to 60, denoting moderate symptomatology, but his July 13, 2011 examination notes indicated that Plaintiff had clear speech, coherent thought, no evidence of panic or anxiety attacks, and controlled mood.  Id.  The ALJ pointed out that Plaintiff did not seek psychiatric treatment until after her date last insured in 2011, but noted that Dr. Strenger indicated that Plaintiff had no short-term memory or cognitive defects in a January 17, 2008 visit.  Id.  The ALJ also cited Plaintiff's 2010 Adult Function Report, in which she acknowledged that she enjoyed socializing with family and friends on the phone, visited her brother daily, could pay bills, count change, handle a savings account, and use a checkbook.  Id.  As such, the ALJ found no objective medical evidence to suggest that Plaintiff's depression and anxiety were not controlled after she began her treatment, thus qualifying the conditions as non-severe impairments.  Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.  In making this determination, the ALJ noted that Plaintiff did not meet the elements of 1.04A because although there was "evidence of positive

straight-leg raising and nerve root compression, Plaintiff's physicians noted that Plaintiff had no

motor, sensory or reflex loss." Tr. 24.  Furthermore, the ALJ determined that Plaintiff did not

meet 1.04B because there was no evidence of spinal arachnoidits in the record.  Id.  Lastly, the

ALJ determined that Plaintiff did not meet 1.04C because she did not require an assistive device

when ambulating.  Id.

Moving to the step four RFC determination, the ALJ found Plaintiff had the RFC to

perform sedentary work as defined in 20 C.F.R. 404.1567(a), except that Plaintiff could

> occasionally push and pull with the left lower extremity and occasionally climb ramps and
> stairs, balance, stoop, kneel, crouch, and crawl, but never climb ropes, ladders or scaffolds.
> [Plaintiff] must avoid concentrated exposure to extreme cold, wetness, humidity, vibration,
> and hazards such as unprotected heights and moving machinery.  [Plaintiff] is limited to
> unskilled work that involves routine and repetitive tasks.

Id.  In making this RFC determination, the ALJ found first that there was a medically

determinable impairment that could reasonably be expected to cause Plaintiff's symptoms, but

that Plaintiff and her husband's statements concerning the intensity, persistence and limiting

effects of the symptoms were not entirely credible to the extent they were inconsistent with

objective medical evidence.  Tr. 25-26.

In his RFC reasoning, the ALJ first noted he was taking Plaintiff's obesity into

consideration.  Tr. 26.  Regarding Plaintiff's lumbar degenerative disc disease, the ALJ found no

evidence in the record that would suggest her impairment is of such severity as would preclude

Plaintiff from all work related activities.  Id.  The ALJ supported this determination by first

referencing the pre-surgery reports of Drs. Vanderbeck, Glass, and Strenger, who reported that

Plaintiff has 5/5 strength in all muscle groups, negative straight leg raise bilaterally, and no

sensory defects.  Id.  The ALJ next cited the post-surgery reports of Dr. Glass and Plaintiff's

physical therapist, Dr. Monteleone, who noted that Plaintiff had 5/5 muscle power, no focal

motor or sensory defects, no significant point tenderness in her lumbar spine, and could perform her physical therapy and other activities.  Tr. 26-27.  The ALJ further cited the reports of Dr. Strenger, which indicated that Plaintiff had negative straight-leg raising bilaterally and no sensory deficits.  Tr. 27.  The ALJ also focused on Dr. Strenger's reports that Plaintiff displayed minimal effort during the examination, that the selective nerve blocks had reduced 80 percent of her pain, and that Plaintiff had been resistant to losing weight and participating in a home exercise program.  Tr. 27.  The ALJ cited Dr. Glass's reports that Plaintiff had 5/5 muscle power and no sensory deficits throughout 2010-2011, and noted that although Dr. Patharkar, on May 18, 2011, found Plaintiff had positive straight-leg raising on the left, he also noted that Plaintiff had 5/5 muscle strength and no focal sensory deficits.  Tr. 27.

In addition, the ALJ referenced the consultative exams of Dr. Khona, which found that Plaintiff had a normal gait and could walk without the use of an assistive device, 5/5 strength, negative straight-leg raising bilaterally, "no lumbar muscle spasm or trigger points, and no muscle atrophy or sensory abnormality."  Tr. 27.  Regarding Dr. Bagner's June 27, 2011 report, the ALJ noted that although Dr. Bagner found Plaintiff had positive straight-leg raising on the left, Plaintiff did not need assistance to ambulate and had no motor or sensory abnormalities.  Id. Furthermore, the ALJ cited the X-ray and MRI data from both pre- and post-surgery, finding no serious problems with the lumbar spine and no disc herniation.  Tr. 27-28.

The ALJ next turned to the opinion evidence of Plaintiff and her doctors.  He noted that although Plaintiff testified that she was severely restricted, she could get her kids ready for school, pack their lunches, can drive, dress, bathe and groom herself, and participates in household chores with her husband.  Tr. 28.  The ALJ further cited Plaintiff's Adult Function

17

Report, on which Plaintiff stated she could prepare meals with assistance from her husband, wash dishes, make beds, and shop for groceries.  Id.

The ALJ gave little weight to Dr. Glass's determination that Plaintiff was to remain out of work, and that Plaintiff could lift and carry less than 10 pounds rarely and could sit and stand for less than two hours in an eight-hour workday.  Tr. 29.  The ALJ found that Dr. Glass's opinions were inconsistent with the objective medical evidence and the record as a whole, including Dr. Glass's own treatment notes, which noted that Plaintiff had negative straight-leg raising, 5/5 muscle power, and no sensory dermatome deficits.  Id.  The ALJ further found that Dr. Glass's opinions were inconsistent with the findings of Dr. Strenger and Dr. Khona, who found Plaintiff had 5/5 strength, negative straight leg raise bilaterally, and no sensory defects. Id.  The ALJ also determined that Dr. Glass's opinions were inconsistent with the opinion of Dr. Bagner, who found that Plaintiff could ambulate independently, and were inconsistent with the diagnostic imaging tests, which "revealed no evidence of spinal stenosis."  Id.

The ALJ gave great weight to Dr. Vanderbeck's October 3, 2007 opinion, which found that Plaintiff was limited to light duty work.  Tr. 29.  The ALJ referred to Dr. Vanderbeck as Plaintiff's "treating physician," stating, "the undersigned assigns great weight to Dr. Vanderbeck's opinion to the extent that it is consistent with the residual functional capacity assessment" because "Dr. Vanderbeck is a treating specialist who has seen the claimant on a regular basis and is therefore best able to provide a detailed longitudinal picture of [Plaintiff's] impairments and resulting limitation (20 CFR 404.1527(d) and SSR 96-2p)."  Id.

The ALJ further gave great weight to the opinion of Dr. Khona, in which he determined that Plaintiff could be trained for desk jobs.  Id.  The ALJ also analyzed the January 28, 2011 RFC assessment of Dr. Park, affirmed by Dr. Udomsaph, and assigned little weight to their

18

opinions that Plaintiff could lift and carry 10 pounds occasionally, could stand for four hours in an eight-hour workday, could sit for six hours in an eight-hour workday, and could push and pull, explaining that he was giving Plaintiff the "benefit of the doubt" that she was more limited than this.  Tr. 29-30.  The ALJ gave great weight to the rest of their opinions because he found they were consistent with the medical record as a whole.  Tr. 30.

The ALJ gave little weight to the part of Dr. McLamon's RFC assessment that indicated Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, had unlimited ability to push and pull, and could climb ramps and stairs, stoop, kneel, crouch, and occasionally climb ladders, again giving Plaintiff benefit of the doubt that she was more limited than this assessment.  Id.  Great weight was assigned to the remainder of the opinion, which stated that Plaintiff could walk for two to three hours in an eight-hour workday and sit for six hours.  Id.

Lastly, the ALJ assigned great weight to the psychiatric assessment of Dr. Castillo-Velez, who found that Plaintiff was mildly limited in the activities of daily living, social functioning, and concentration.  Id.  As such, considering all the medical evidence and inconsistencies, the ALJ found that Plaintiff could perform the work activities in the RFC.  Id.

At step five, the ALJ found that through the date last insured, Plaintiff was unable to perform any past relevant work.  Id.  However, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in the national economy in significant numbers that Plaintiff could perform.  Tr. 32.  In making this determination, the ALJ relied on the testimony of the VE, which he opined was consistent with the DOT.  Id.  Thus the ALJ made a final determination of not disabled.  Id.

**B.  Analysis**

19

Plaintiff presents four arguments on appeal of the Commissioner's final decision.  First, Plaintiff contends that the ALJ failed to appropriately weigh the opinion evidence of Plaintiff's treating physician, Dr. Glass, and other critical medical opinions on record.  Pl. Br. 7.  Next, Plaintiff argues that the ALJ failed to properly evaluate all of the Plaintiff's impairments in formulating Plaintiff's RFC.  Pl. Br. 13.  Third, Plaintiff maintains that the ALJ improperly discounted Plaintiff's testimony regarding the symptom-related limitations that she suffers.  Pl. Br. 21.  Fourth, Plaintiff argues that the ALJ improperly denied benefits based on inconsistent and unreliable testimony of the VE.  Pl. Br. 24.  The Court will address these arguments in turn.

### 1. The ALJ improperly weighed the opinion of Plaintiff's treating physician and other critical medical opinions on record.

As the trier of fact, the ALJ has the duty to resolve conflicting medical evidence.  Hatton v. Comm'r of Soc. Sec. Admin., 131 Fed. App'x 877, 880 (3d Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  Where there is conflicting medical evidence, the ALJ may choose whom to credit, but must give reasons for discounting the evidence.  Richardson v. Comm'r of Soc. Sec., No. 12-6422, 2013 WL 5816883, at *7 (D.N.J. Oct. 29, 2013) (citing Plummer v. Apfel, 186 F.3d at 429).  "[A] reviewing court should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such opinions was supported by substantial evidence."  Hatton, 131 Fed. App'x at 880 (citing Monsour Med. Ctr. v. Heckler, 806 F.3d 1185, 1190 (3d Cir. 1986)).

Plaintiff argues that the ALJ erred in failing to properly weigh the opinion of Dr. Glass, who found that Plaintiff had less than sedentary work capacities.  Plaintiff contends that the ALJ was incorrect in determining that Dr. Glass's RFC opinion was inconsistent with Dr. Glass's own treatment notes, the opinions of other doctors in the record, and the evidence in the record as a whole.  Additionally, Plaintiff argues that the ALJ erred in giving great weight to the opinion of

Dr. Vanderbeck that Plaintiff could perform "light duty" work, due to his perceived status as Plaintiff's treating physician.

Dr. Vanderbeck was not Plaintiff's treating physician.  The record reflects that Dr. Vanderbeck only examined Plaintiff once, on October 3, 2007, just a few days after the alleged onset date.  Tr. 770.  The ALJ correctly recognized that under 20 C.F.R. § 404.1527 and SSR 96-2p, the treating source should be considered as a persuasive source in determining an RFC assessment.  Tr. 29.  However, Social Security Regulations define the "treating source" as:

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

20 C.F.R. § 404.1502.  Under this standard, Dr. Glass rather than Dr. Vanderbeck qualifies as Plaintiff's treating physician, since Dr. Glass consistently evaluated Plaintiff from 2007 to 2011, and performed Plaintiff's back fusion surgery.  Tr. 616-643.  Based on the ALJ's own rationale as to why Dr. Vanderbeck's opinion was entitled to great weight, great weight can be awarded instead to the assessment of Dr. Glass.

The Court recognizes that, even correcting for the identity of the treating source, "controlling weight" can only be given to the opinion of Dr. Glass if it is "not inconsistent" with the other "substantial evidence" in the record.  SSR 96-2p; 20 C.F.R. § 404.1527(c)(2).  The ALJ assigned little weight to Dr. Glass's opinion because he found it to be inconsistent with Dr. Glass's own treatment notes, as well as the treatment notes of Drs. Strenger, Khona, and Bagner. Tr. 29.  Specifically, the ALJ points to the findings of Drs. Glass and Strenger that Plaintiff had 5/5 muscle power, negative leg raise bilaterally, and no sensory deficits.  Tr. 29.  The ALJ

21

further cited the evaluation notes of Drs. Khona and Bagner, which indicated that Plaintiff had 5/5 strength, negative straight-leg raising bilaterally, and that Plaintiff did not need a cane or crutches to ambulate.  Tr. 29.  Based on these reports, the ALJ found Dr. Glass's opinion to be inconsistent with the record as a whole.  Tr. 29.

 "[A]n ALJ may not reject pertinent or probative evidence without explanation."  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).  Here, the ALJ disregarded some of Dr. Glass's determinations.  For example, the ALJ noted that on August 12, 2008, Dr. Glass did not find tenderness in Plaintiff's lumbar spine, but he failed to note that Dr. Glass found lower lumbar point tenderness on June 26, 2008, and July 10, 2008.  Tr. 26-27, 633, 635.  Furthermore, the ALJ did not comment on the consistency of Dr. Glass's opinion with that of Dr. Patharkar, who treated Plaintiff for over one year.  Although the ALJ did briefly note Dr. Patharkar's determination that Plaintiff had 5/5 muscle strength in her bilateral extremities, he did not consider Dr. Patharkar's other determinations in weighing Dr. Glass's opinion evidence, such as his finding of Plaintiff's "hypersensitivity to touch" and positive straight leg raise tests.  Tr. 27, 864, 876, 880, 888.  The ALJ thus erred in failing to explain why he did not consider such pertinent evidence.

Even if Dr. Glass's opinion may not be entitled to controlling weight, this Court finds that it may still be entitled to deference.  See SSR 96-2p, 1996 WL374188, at *4 (July 2, 1996) (holding that even where a treating source medical opinion is not entitled to controlling weight because it is inconsistent with other substantial evidence, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927").  Considering that the ALJ failed to take into account some pertinent evidence, compounded with the error of regarding Dr. Vanderbeck as Plaintiff's treating

physician, this Court cannot conclude that the ALJ's decision was supported by substantial evidence.  See Morales, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'") (quoting Plummer, 186 F.3d at 429).  The evidence necessitates a further review of whether Dr. Glass's opinions were actually inconsistent with the record.  As such, this case will be remanded to the ALJ to reconsider the opinions of Dr. Glass and Dr. Vanderbeck.

## 2.   The ALJ properly accounted for Plaintiff's limitations in his RFC assessment.

Plaintiff next argues that the ALJ erred in conducting the function-by-function assessment of Plaintiff's limitations stemming from both severe and non-severe impairments, pursuant to SSR 96-8p.  Specifically, Plaintiff argues the ALJ "failed to properly find the Plaintiff's depression and anxiety to be severe impairments that significantly limit the claimant's ability to function and sustain gainful employment."  Pl. Br. 17.  Plaintiff cites the findings of Dr. Brown, which indicated "an adjustment disorder with mixed depressed anxiety causing at least moderate limitations in social and occupational function as evidenced by the assigned GAF score of 55-60."  Pl. Br. 17.  Plaintiff also cites Dr. Strenger's report, which noted that Plaintiff had "depression superimposed upon her chronic pain."  Pl. Br. 17.  Plaintiff further argues that the ALJ erred by giving great weight to the findings of Dr. Castillo-Velez, which indicated Plaintiff had only mild limitations, because the ALJ gave no consideration for why he accepted this evidence and not the conflicting evidence of Drs. Brown and Strenger.  Pl. Br. 18.  As such, Plaintiff argues that her psychiatric impairments should have been deemed "severe" at step two of the sequential analysis and then considered on a "function-by-function" basis in order to properly formulate Plaintiff's RFC.  Pl. Br. 17-18.

Reading the ALJ's opinion as a whole, Plaintiff's argument is without merit.  The ALJ's step two determinations that Plaintiff's anxiety and depression were non-severe impairments considered the evidence of Drs. Strenger and Brown, as well as evidence from Dr. Shupe, and found that Plaintiff's GAF scores indicated only moderate or mild symptomology.  Tr. 23.  The ALJ also cited other evidence indicating that Plaintiff's anxiety and depression were not severe.  Tr. 23.  See supra, Section III(A).  In fact, the findings of Dr. Castillo-Velez that were adverse to Plaintiff were not even considered at this step; instead, they were mentioned at step four to support the ALJ's RFC determination, where the ALJ explained that Dr. Castillo-Velez's opinion was given great weight because it was consistent with the record as a whole, which includes the opinions of Drs. Strenger and Brown.  Tr. 30.  As such, the ALJ's step four RFC determination regarding Plaintiff's mental impairments was supported by substantial evidence.[1]

Plaintiff further argues that the RFC determination was deficient because it "fails to define critical terms," namely "unskilled" work, and therefore it is impossible for a VE to respond to the ALJ's hypothetical, and for a reviewing court to determine if Plaintiff's limitations were addressed in discussing the RFC.  Pl. Br. 18-19.  Plaintiff argues that the ALJ's statement that "a limitation of unskilled work that involves routine and repetitive tasks was assigned to consider [Plaintiff's] pain and non-severe depression and anxiety," Tr. 28, was not sufficient to constitute a full appraisal of Plaintiff's limitations regarding the formulation of an RFC.

---

[1] The Court also finds that substantial evidence supported the ALJ's finding that Plaintiff's mental impairments were non-severe at step two.  The Court notes that the ALJ ruled in Plaintiff's favor at step two by finding that she had other severe impairments that would prevent a finding of not disabled at that step and cease the sequential analysis.  Accordingly, to the extent that Plaintiff is arguing that the ALJ erred in not finding her mental impairments severe at step two, this argument is without merit.  See Salles v. Comm'r of Soc. Sec., 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [plaintiff's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)).

SSR 96-8p notes that a "function-by-function basis" refers to the functions articulated by paragraphs (b), (c), and (d) of 20 C.F.R. § 404.1545.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  Paragraph (c), which addresses mental abilities, states:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c).  It appears that Plaintiff is arguing that the ALJ should have provided more detail regarding the mental impairments in his RFC determination.  However, the ALJ had already detailed the extent of Plaintiff's mental impairments in determining that they were non-severe at step two; to again explain the extent of Plaintiff's mental limitations in making the RFC determination would be redundant.  The ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis."  Jones, 364 F.3d at 505 (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119-20 (3d Cir. 2000)).  The Court thus finds that the ALJ properly considered Plaintiffs mental limitations in limiting her to unskilled work.

Plaintiff also argues that the ALJ failed to properly consider Plaintiff's obesity pursuant to SSR 02-1p because he did not discuss how this impairment created limitations that still allowed Plaintiff to perform sedentary work.  The Court does not agree.  The ALJ stated:

> As indicated in SSR 02-1p, obesity may have an adverse impact upon co-existing impairments.  For example, obesity may affect the cardio vascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart.  Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone.  In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule.  These conclusions have been taken into account in reaching the conclusions herein.

Tr. 26 (emphasis added.).  The ALJ also articulated that "[a] limitation of occasional pushing and pulling with the left lower extremity, and all postural movements occasionally but no climbing ropes, ladders or scaffolds, and avoiding concentrated exposure to extreme cold, wetness, humidity, vibration, and hazards was assigned to consider [Plaintiff's] degenerative disc disease and obesity."  Tr. 28 (emphasis added).  As long as the ALJ considers the impact of obesity along with the impact of Plaintiff's other impairments, the ALJ has properly considered obesity. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504-05 (3d Cir. 2009).  See also Douglas v. Astrue, No. 09-1535, 2011 WL 482501, at *4 (E.D. Pa. Feb. 4, 2011) (holding that an ALJ's express consideration of a plaintiff's obesity on claimed impairments is sufficient to constitute considerations of obesity).  For these reasons, the Court rejects Plaintiff's second argument.

   **3.  The ALJ properly discounted Plaintiff's testimony regarding the symptom-related limitations that she suffers.**

   Plaintiff contends that the ALJ erred in discounting Plaintiff's subjective complaints of pain and limitations, as well as the statements of her husband, Mr. Porter, because the medical evidence actually supports their opinions.  Plaintiff is presumably referring to her statements at her hearing before the ALJ that she experiences pain "all the time," that the pain in her leg "feels like somebody is stabbing my leg," and that on many days her pain is an 8 out of 10, as well as Mr. Porter's statements regarding Plaintiff's ability to perform work in his Adult Third Party Functioning Report.  Tr. 56-57, 220-27.  Plaintiff maintains that their statements should have been granted greater weight because they were supported by the treatment notes of Drs. Glass, Strenger, and Patharker, which indicated that Plaintiff remained in pain despite treatment. Plaintiff further asserts that the ALJ merely used stock language that stated a conclusion as to her and Mr. Porter's credibility, and failed to provide an actual credibility assessment.

Plaintiff's argument makes the Court question counsel's familiarity with legal writing. The ALJ did offer a conclusion, stating that that he "finds that [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this opinion."  Tr. 26 (emphasis added).  As is often the case in formulating a well-organized opinion, the ALJ then went on to explain and support his conclusion.  The ALJ discussed evidence from Dr. Vandebeck, Dr. Glass, Plaintiff's physical therapist, Dr. Strenger, Dr. Khona, and Dr. Bagner in determining that Plaintiff's opinions were not entirely credible. Tr. 26-27.  The ALJ further opined that "there are no diagnostic tests in the record that are consistent with the claimant's description of the severity and intensity of her back issues," and discussed Plaintiff's X-ray and MRI records.  Tr. 27-28.  The ALJ also considered Plaintiff's own conflicting statements, noting that Plaintiff "testified that she gets her kids ready for school, packs their lunch, washes dishes and laundry, shops, and can drive a car," and that she reported that she "was able to take care of her two children and dog, . . . wash dishes, dust, make beds, drive a car, and shop in stores for groceries."  Tr. 28.  The ALJ thus complied with SSR 96-7p by including "specific reasons for the finding on credibility, supported by evidence in the case record, [which is] sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

Plaintiff argues that the ALJ may not discount her complaints without contrary medical evidence, citing Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984).  However, Green is distinguishable.  There, the court determined that the ALJ should not have dismissed the claimant's subjective complaints of dizziness on the basis of the absence of direct medical evidence of dizziness, because the claimant's objectively verified conditions could reasonably be

said to produce dizziness.  Id. at 1070-71.  Here, the ALJ did not discount Plaintiff's testimony because of a lack of direct medical evidence that would produce her symptoms; rather, he evaluated the intensity and persistence of those symptoms by looking at the objective medical evidence and various other factors.  See 20 C.F.R. § 404.1529(c)(1)-(3).  The ALJ thus properly adhered to 20 C.F.R. § 404.1529 in evaluating Plaintiff's statements.  The Third Circuit has held that testimony regarding subjective pain and the ability to perform work is only entitled to great weight "when . . . it is supported by competent medical evidence."  Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).  The ALJ need not have pointed to contrary medical evidence to make its credibility determination.  Thus, a review of the record demonstrates that the ALJ's determination regarding the credibility of Plaintiff's and Mr. Porter's statements is supported by substantial evidence.

### 4. The ALJ properly denied benefits based on competent vocational expert testimony.

Plaintiff argues that the VE provided an overstated and inaccurate estimate of the jobs that Plaintiff could perform in the national economy, and thus the ALJ erred in his step five determination that Plaintiff was not disabled.  Specifically, Plaintiff asserts that the figures provided regarding both the lens inserter and small parts assembler positions—that there were 235,910 jobs nationally—were incorrect because they were derived from the Bureau of Labor Statistics Standard Occupational Classification ("SOC"), and not the DOT, as stated by the VE. According to Plaintiff, the DOT code speaks to only one specific occupation, while the SOC code includes many different occupations.  The number the VE put forth for lens inserter and small parts assembler actually referred to SOC code 51-9399, which is the category of "Production Workers, All Other."  There are 1,589 DOT occupations under this SOC, with lens inserter and small parts assembler being just two of them.  Pl. Br. 24.  Thus, because the

28

individual job numbers for lens inserter and small parts assembler provided were incorrect, the ALJ had no way to determine whether "significant" jobs existed in the national economy pursuant to 20 C.F.R. 404.1560(c)(2).  Pl. Br. 25.

At step five, the Commissioner bears the burden of proof to show that the plaintiff can perform alternative work that exists in significant numbers in the national economy given her age, education, past work experience, and RFC.  20 C.F.R. §§ 404.1520(g), 404.1560(c); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).  The Commissioner meets this burden when she identifies at least one occupation in the national economy that the plaintiff can perform.  Wright v. Sullivan, 900 F.2d 675, 679 (3d Cir. 1990) (citing 20 C.F.R. § 404.1566).  "An 'occupation' refers to a grouping of numerous individual 'jobs' with similar duties.  Within occupations . . . there may be variations among jobs performed for different employers. . . ."  SSR 96-9p, 1996 WL 374185, at *3 n.4 (July 2, 1996).   The regulations provide that "[w]hen we determine that unskilled, sedentary, light, and medium jobs exist in the national economy . . . we will take administrative notice of reliable job information available from various governmental and other publications."  20 C.F.R. § 404.1566(d).  Though not specifically listed, this Court finds that the SOC qualifies as "reliable job information available from various governmental and other publications."  See McKinnon v. Comm'r of Soc. Sec., No. 12-4717, 2013 WL 5410696, at *5 (D.N.J. Sept. 26, 2013).  The VE therefore properly relied upon the SOC for the statistical data for the jobs of lens inserter and small parts assembler.

Moreover, the VE also testified that Plaintiff could perform the position of laminator, which exists at the numbers of 66,330 nationally and 1,740 regionally.  Tr. 79.  The Third Circuit has found that as few as 200 jobs can be indicative of the existence of significant work in the local and national economy.  See Craigie v. Bowen, 835 F.2d 56, 58 (3d Cir. 1987); see also

Russo v. Comm'r of Soc. Sec., No. 13-06918, 2014 WL 6991987, at *12 (D.N.J. Dec. 10, 2014) (holding that 200 jobs in the regional economy is sufficient to satisfy the step five standard). The number of laminator jobs clearly satisfies the step five standard. The Court thus finds that the ALJ's decision at step five is supported by substantial evidence.

## IV.   CONCLUSION

The Court finds that remand is appropriate.[2] Out of Plaintiff's arguments, the Court finds only the first persuasive – that the ALJ failed to properly weigh the opinion evidence of Plaintiff's treating physician, and other medical opinions of record. The final decision of the Commissioner is therefore **VACATED** and the case is **REMANDED** for further proceedings consistent with this Opinion. An accompanying Order shall issue.

Dated:  4/30/2015                                                       s/ Robert B. Kugler
                                                                                  ROBERT B. KUGLER
                                                                                  United States District Judge

---

[2] In light of the Court's finding that the ALJ erred in weighing certain medical opinion evidence, see supra, Section III(B)(1), Plaintiff's final argument that the administrative record provides sufficient basis for this Court to award summary judgment must fail.  See Morales, 225 F.3d at 320 ("[T]he decision to . . . award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits.")  (quoting Podedworny v. Harris, 745 F.2d 210, 222 (3d Cir. 1984)).